STATE v. DENNISON

[171 N.C. App. 504 (2005)]

———————

STATE OF NORTH CAROLINA v. DARREN WILLIAM DENNISON

No. COA02-1512-2

(Filed 19 July 2005)

**1. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence—premeditation and deliberation**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder even though defendant contends there was insufficient evidence of his premeditation and deliberation, because: (1) the doctor who performed the autopsy of the victim testified to the brutality of the wounds and in his opinion the multiple slashes were caused by repeated blows from defendant's knife; (2) evidence was presented that the victim harassed defendant and defendant left the scene after stabbing the victim; (3) with close or borderline cases on the issue of insufficient evidence, there is a clear preference for submitting the issue to the jury; and (4) defendant stabbed a man who was smaller than he was eight times in a public place and the victim was the only person potentially threatening him at the time.

**2. Homicide— self-defense—instructions—plain error review**

The Court of Appeals is bound by a Supreme Court opinion that defendant failed to properly assert plain error in this murder case; furthermore, a review of the entire record and instructions as a whole reveals that the trial court did not commit plain error by instructing the jury that defendant would lose the bene-

fit of self-defense if he was the initial aggressor or the jury determined that defendant used more force than necessary under the circumstances.

Appeal by defendant from judgment entered 20 May 2002 by Judge A. Moses Massey in Guilford County Superior Court. Heard in the Court of Appeals 10 September 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Daniel Shatz for defendant-appellant.*

ELMORE, Judge.

Darren William Dennison (defendant) appeals from a judgment entered 20 May 2002 consistent with a jury verdict finding him guilty of the first-degree murder of Chad Everette Spaul (Mr. Spaul). The trial court sentenced defendant to life imprisonment without parole and, after extensive appellate review, we find that defendant received a fair trial, free from prejudicial error.

I.

This Court has previously examined defendant's trial and conviction for first-degree murder. On 6 April 2004, we filed *State v. Dennison*, 163 N.C. App. 375, 594 S.E.2d 82 (2004), *rev'd per curiam*, 359 N.C. 312, 608 S.E.2d 756 (2005), in which we determined that defendant was entitled to a new trial based upon the prejudicial error of admitting evidence regarding defendant's prior violent acts against a former girlfriend. The State appealed to our Supreme Court, which held that defendant failed to properly preserve that error for appellate review. *State v. Dennison*, 359 N.C. 312, 312, 608 S.E.2d 756, 757 (2005). Accordingly, our Supreme Court remanded the case back to this Court so that we may review defendant's other preserved errors. *Id.* at 313, 608 S.E.2d at 757. As such, we will address the trial court's denial of defendant's motion to dismiss and its instructions to the jury on self-defense. And although the facts of this case were adequately laid out in our previous opinion, since this opinion will supercede the former, we will recite them again.

II.

The evidence presented at trial tended to show that on the evening of 21 September 2001, defendant, defendant's girlfriend

Melanie Gammons, and Charlene Waller traveled together to the Challenger Sports Bar in High Point, North Carolina. Among those also present at the crowded bar that evening were Delores Vail and her sister Diane Lovern; Lovern's daughter Tracy Boone and Boone's boyfriend, Jeff Peele; and Mr. Spaul and Mr. Spaul's co-worker, David Moore.

Waller testified that after she, defendant, and Gammons played two games of a NASCAR-themed board game popular with the bar's patrons, they stepped outside along with Vail, and that Moore, whom she did not know, then approached the group and "got in [her] face." Waller briefly went back inside the bar with Vail, only to re-emerge after Moore followed them inside. Waller testified that when she and Vail exited the bar the second time, they went around to the side of the building, where they encountered Michael Crane, and that they were soon joined there by defendant, Gammons, and Moore. Several witnesses testified that Moore had been trying unsuccessfully throughout the evening to speak with Vail, with whom he had been romantically involved several years earlier, and Waller testified that Moore was continuing to do so at this point.

According to the testimony of various witnesses, Mr. Spaul then came outside the bar and approached the group, just as a visibly upset Moore was walking away, and Mr. Spaul and Moore spoke briefly outside the hearing of the others before Moore re-entered the bar. Lovern, who had by this time stepped outside the bar, testified that Mr. Spaul then began "arguing and carrying on with . . . mostly [Gammons] and [Waller] . . . but he was trying to start with [defendant]." Waller and Lovern each testified that Mr. Spaul then began calling defendant "faggot," "fag," and "queer." At that point, defendant, Gammons, Waller, and Crane walked back around to the front of the building in an attempt to get away from Mr. Spaul, who followed the group and continued to call defendant names. The group moved three or four times to various locations around the building in an effort to defuse the situation, but Mr. Spaul continued to follow the group and continued to behave belligerently towards defendant. Lovern, Moore, and the bar's owner each tried, to no avail, to get Mr. Spaul to desist.

According to Waller, Mr. Spaul then briefly re-entered the bar, but shortly thereafter he emerged with a bottle of beer and resumed calling defendant a "faggot." Mr. Spaul exchanged words with Waller and Gammons and then stated that he was going to hit Crane, who was standing next to defendant. According to the testimony of Waller,

Lovern, and Peele, each of whom witnessed this portion of the fatal confrontation between defendant and Mr. Spaul, Mr. Spaul first struck Crane, and then defendant, in rapid succession with his fist, causing Crane to fall to the ground and defendant to be knocked down and against a post. Waller testified that after Mr. Spaul hit Crane and defendant, she ran into the bar to get help. Lovern testified that when "[defendant] got up, he went to swinging" at Mr. Spaul, at which point she "was pushed out of the way, and that's all [she] saw" until she turned back around and saw Mr. Spaul on the ground "and a lot of blood." Lovern's testimony was generally corroborated by that of Peele. Defendant was six feet two inches tall and weighed approximately 215 pounds at the time, while Mr. Spaul was five feet, eleven inches tall and weighed approximately 165 pounds. Both defendant and Mr. Spaul had been drinking before the altercation.

Dr. Thomas Clark, the forensic pathologist who performed Mr. Spaul's autopsy, testified that Mr. Spaul suffered eight sharp-force injuries inflicted with a knife. The most significant wound went "across the middle of the body and the right side of the neck . . . [and] cut both of the carotid arteries," which, in Dr. Clark's opinion, caused Mr. Spaul to bleed to death. None of the other seven wounds were as significant, and several were described as "superficial" by Dr. Clark. In Dr. Clark's opinion, all of Mr. Spaul's injuries could not have been inflicted by a single swing of a knife, although some of the wounds were on a linear track.

Defendant testified at trial and admitted cutting Mr. Spaul with a knife he regularly carried, but only after Mr. Spaul repeatedly called defendant names, followed defendant around outside the bar when defendant tried to avoid confrontation, and eventually struck defendant in the head. Defendant testified he "believe[d he] was hit with a beer bottle," but neither defendant nor any other witness testified that they actually saw Mr. Spaul wield a beer bottle when he struck defendant. Defendant testified that as Mr. Spaul was attempting to strike him a second time, defendant pulled his knife out of his pocket and pushed upward with the knife, cutting Mr. Spaul. Defendant testified that he "did not mean to kill [Mr. Spaul]," but rather that he "meant . . . to cut [Mr. Spaul] to get him off of me."

Defendant, Gammons, and Waller then got in Waller's car and left the scene. Defendant testified that he left because he was scared of Moore, who upon seeing Mr. Spaul prone and bleeding profusely threatened to kill defendant, and beat on Waller's car as the car pulled out of the parking lot. Defendant, Gammons, and Waller proceeded to

Waller's home, where defendant showered and changed his clothes, which were stained with Mr. Spaul's blood. Defendant testified that because he feared the police would find him at Waller's house, the group was then driven to a motel by a third person, at which point defendant telephoned the bar and was informed that Mr. Spaul was dead. After contacting the High Point police department, defendant turned himself in at 5:00 p.m. the following afternoon.

Defendant moved to dismiss the charges against him at the close of the State's evidence and again at the close of all evidence; each motion was denied. Prior to the jury charge, defendant moved for a mistrial based on the improper admission of evidence concerning defendant's character, which motion was also denied. The jury subsequently returned a verdict finding defendant guilty of first-degree murder, and the trial court sentenced defendant to life imprisonment.

III.

[1] Defendant contends that the State has presented insufficient evidence of his premeditation and deliberation, a necessary element of first-degree murder. When a defendant moves for dismissal, "the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). Substantial evidence is that evidence which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)). In determining whether the State's evidence is substantial, the trial court must examine the evidence in the light most favorable to the State, and "the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* at 237, 400 S.E.2d at 61 (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)).

Our appellate courts have held that "[p]remeditation is present where the defendant formed a specific intent to kill the victim some period of time, no matter how short, prior to perpetrating the actual act. . . . Deliberation is acting in a cool state of blood and not under the influence of a violent passion." *State v. Andrews*, 154 N.C. App. 553, 561, 572 S.E.2d 798, 804 (2002) (citations omitted), *cert. denied*, 358 N.C. 156, 592 S.E.2d 696 (2004). But still, "[o]ne may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by

passion at the time." *Vause*, 328 N.C. at 238, 400 S.E.2d at 62. Premeditation and deliberation "are usually proven by circumstantial evidence because they are mental processes that are not readily susceptible to proof by direct evidence." *State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994). Among the circumstances from which premeditation and deliberation may properly be inferred in a prosecution for first-degree murder are:

(1) lack of provocation on the part of the deceased, (2) the conduct and statements of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill-will or previous difficulty between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Vause*, 328 N.C. at 238, 400 S.E.2d at 62.

Taken in the light most favorable to the State, there is substantial evidence of premeditation and deliberation. Relative to the sixth and seventh factors, Dr. Clark testified to the brutality of the wounds and in his opinion the multiple slashes were caused by repeated blows from defendant's knife. Evidence was also presented, relative to the second factor, that suggested Mr. Spaul was harassing defendant and after the stabbing defendant left the scene. These points may not be significant by themselves, but taken together are evidence of premeditation and deliberation that a juror could find adequate. Moreover, with close or borderline cases on he issue of insufficient evidence, there is a clear preference for submitting the issue to the jury. *State v. Hamilton*, 77 N.C. App. 506, 512, 335 S.E.2d 506, 510 (1985), *disc. review denied*, 315 N.C. 593, 341 S.E.2d 33 (1986).

Defendant claims that *State v. Corn*, 303 N.C. 293, 278 S.E.2d 221 (1981), is controlling on the lack of evidence regarding premeditation and deliberation. However, we find the facts in *Corn* different from defendant's situation. The defendant in *Corn* shot at one of two men—both bigger than him and one with a history of violence—who were charging at him while he was on the couch in his home. Here, defendant stabbed a man—who was smaller than defendant—eight times in a public place, and the victim was the only person potentially threatening him at the time.

IV.

[2] Defendant also assigns error to the trial court's instruction that defendant would lose the benefit of self-defense if he was the initial aggressor or the jury determined defendant used more force than necessary under the circumstances. Defendant asserts we should conduct plain error review of the instructions on these points.

Yet, our Supreme Court has already held that defendant failed to properly assert plain error concerning the admission of defendant's violent acts. *Dennison*, 359 N.C. at 312-13, 608 S.E.2d at 757. We are admittedly at a loss to distinguish defendant's assertions of plain error regarding the trial court's instructions, in which he states "[d]efendant asserts plain error," from those that the North Carolina Supreme Court determined did not "specifically and distinctly" assert plain error. *Id.* One of those assignments stated, "[t]o the extent that this issue is not preserved for appellate review, the defendant asserts plain error," and we are not able to discern what more defendant could have said to preserve this issue for plain error review.

However, although we are bound by our Supreme Court's opinion dismissing plain error review in this case, after reviewing the entire record and the instructions as a whole, we see no merit in defendant's contentions that the instructions in this case misled or confused the jury.

No error.

Judges TIMMONS-GOODSON and HUDSON concur.